NOT DESIGNATED FOR PUBLICATION

No. 128,453

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

VALERIE R. WILSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID KAUFMAN, judge. Oral argument held April 14, 2026. Opinion filed June 26, 2026. Affirmed.

*Jakob Ladanyi*, of Ladanyi Law LLC, of Wichita, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before CLINE, P.J., BOLTON FLEMING, J., and JEFFREY GETTLER, District Judge, assigned.

BOLTON FLEMING, J.: Valerie R. Wilson was convicted of misdemeanor possession of a firearm while under the influence in violation of K.S.A. 21-6332(a) and both alternative counts of misdemeanor driving under the influence (DUI) when the alcohol concentration in her breath or blood was .08 or more, and/or when she was incapable of safely driving a vehicle, contrary to K.S.A. 8-1567(a)(2), (a)(3), (b)(1)(A). The district court merged Wilson's DUI convictions at sentencing.

In this appeal we are asked to consider the constitutionality of K.S.A. 21-6332(a) under the Second Amendment to the United States Constitution. We are also tasked with considering the statute's potential vagueness and overbreadth. Finally, we are asked to consider whether sufficient evidence supports either of the grounds forming the basis of Wilson's DUI convictions. Wilson maintains that there was insufficient evidence to prove she was operating or attempting to operate a motor vehicle at the time she was under the influence.

We first find that both on its face and as applied to Wilson, K.S.A. 21-6332(a) is constitutional under the Second Amendment. The statute is based on analogous laws from our nation's history and is narrowly limited in scope. We also find after applying a presumption of constitutionality that K.S.A. 21-6332(a) is not vague or overbroad. Finally, we conclude that there was sufficient evidence that Wilson operated her vehicle while intoxicated. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Valerie R. Wilson was involved in an incident that occurred in the early morning hours of July 25, 2023, in Sedgwick County. Christopher Bolden, a private citizen, was at a stop sign when he observed a vehicle with brake or taillights on and the horn blowing. He rolled past the vehicle and saw the driver slumped over the steering wheel, with the driver's head resting on the horn. Bolden thought the person might need help and called 911.

At approximately 5:47 a.m., Officer Logan Fira, an officer with the Wichita Police Department, responded to the 911 call for a welfare check. Officer Fira located a vehicle fitting the description given by Bolden—a blue Dodge Durango. Fira heard the vehicle's horn from a block or two away.

2

Fira approached the vehicle with her body camera activated and made several verbal announcements that she was a police officer. Fira also flashed her light into the vehicle to see if the occupant would stir. When the occupant failed to respond, Officer Fira opened the unlocked door, and the female driver sat up in her seat, confused.

Fira asked the driver to step out of the vehicle for safety. The driver did not exit the vehicle, but instead responded, "We good. We good." The driver also told Fira she was coming home from work and was just around the corner from her home. As Fira continued talking, the woman made a statement, "Let me just turn over right here where that U is at," and gestured toward the intersection. Wilson also remarked that she was "trying to make it home."

As Officer Fira assisted the driver exit the vehicle, the driver identified herself as "Valerie." Fira observed that the woman was slurring and repeating herself. The driver stumbled and fell into the driver's side door. She eventually provided her last name— "Wilson."

Fira asked Wilson if she needed medical assistance. Wilson was agitated and accused Fira of pulling her over for no reason. Fira explained to Wilson she did not pull her over. Wilson accused Fira of lying and said, "I just turned the corner . . . ." Wilson explained that she was just around the corner from her home and told Fira multiple times that she was coming home from work. Wilson's home was nearby on N. Spruce Street, and her job was on North Webb Road. Fira observed that keys were in the ignition and the running lights were on, but Wilson's hands were not on the keys, the wheel, or the ignition.

Other officers arrived on scene, and Officer Fira was able to use one of their electronic devices to confirm Wilson had a valid driver's license. Officer Derek Ervin of the Wichita Police Department was one of the additional officers that arrived as a back-

up to Officer Fira. When Ervin arrived on scene, Fira was engaged with the driver, so he walked around the vehicle, looking inside. Ervin noticed a black firearm on the floorboard of the backseat. Wilson stated the firearm was registered to her. Ervin observed the firearm was loaded with seven rounds in the magazine but it did not have a round chambered. Ervin believed the firearm could be reached from the driver's seat. Officer Fira collected the firearm as evidence. The firearm was identified as a "black Hi-Point 9mm carbine rifle."

Jared Thomas, a Traffic Enforcement Officer for the City of Wichita, was also dispatched around 6 a.m. to assist. Thomas was briefed by the officers at the scene and then contacted Wilson, who was in the back of the police vehicle. Thomas noticed an odor of alcoholic beverage and, based on his observations, believed Wilson was unable to operate a motor vehicle.

Fira arrested Wilson as being under the influence due to Wilson's lack of balance, slurred speech, inability to comprehend questions, and repetitive language. At the jail, Wilson consented to a breath sample, which was performed at 7:37 a.m. It showed a blood alcohol level of .166.

Wilson was charged with misdemeanor possession of a firearm while under the influence in violation of K.S.A. 21-6332(a). She was also charged with alternative counts of misdemeanor DUI based on the alcohol concentration in Wilson's breath or blood being 0.08 or more, and/or being incapable of safely driving a motor vehicle, contrary to K.S.A. 8-1567(a)(2), (a)(3)(b), (1)(A), respectively.

Prior to her trial, Wilson filed a motion to declare K.S.A. 21-6332(a) unconstitutional, arguing that the statute violates the Second Amendment to the United States Constitution "as written and as applied." Wilson also filed two subsequent amended motions.

4

Wilson waived her right to a jury trial and agreed to have the district court consider her motion as a part of her bench trial. A bench trial was held on July 17, 2024. The parties presented their arguments on Wilson's motion prior to the district court receiving evidence. Wilson stipulated that the firearm at issue was a working firearm and that her blood alcohol concentration was above 0.08. After the parties finished presenting evidence, the court took the motion and the verdict under advisement.

On September 5, 2024, the district court rendered its decision denying Wilson's motion to declare K.S.A. 21-6332(a) unconstitutional and finding Wilson guilty on all charges. The district court merged the DUI convictions. Wilson was sentenced to 12 months in jail for possessing a firearm under the influence, and 6 months in jail for driving under the influence, with the sentences running concurrent. The district court suspended Wilson's sentences and placed her on probation.

Wilson timely appeals.

ANALYSIS

IS K.S.A. 21-6332(a) AN UNCONSTITUTIONAL RESTRAINT ON THE RIGHT TO BEAR ARMS?

Wilson's first argument on appeal is that K.S.A. 21-6332(a) is an unconstitutional restraint on the right to bear arms—a right found under the Second Amendment of the United States Constitution and section 4 of the Kansas Constitution Bill of Rights.

*Standard of Review*

"A statute's constitutionality is a question of law subject to unlimited review. Appellate courts generally presume statutes are constitutional and resolve all doubts in

favor of a statute's validity. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018)." *State v. McCray*, 321 Kan. 316, 320, 579 P.3d 126 (2025).

*Discussion*

We first note that Wilson challenges her convictions as a violation under the United States Constitution as well as a violation of section 4 of the Kansas Constitution's Bill of Rights. Wilson only raises her argument under the Kansas Constitution in the introduction section of her brief. In the first paragraph of her analysis, Wilson cites the language of section 4 but makes no argument. Other than these brief references to the existence of section 4, Wilson makes no actual argument as to any alleged violation of section 4 of the Kansas Constitution Bill of Rights. We note that an analysis of rights under section 4 of the Kansas Constitution Bill of Rights cannot occur by simply referencing section 4 and conducting a Second Amendment analysis. "Given the present language of section 4, we may safely conclude it establishes enumerated protections distinct from 'the right to keep and bear arms' described in the Second Amendment. In other words, the amended version of section 4 does not create a lockstep right that merely (and automatically) mirrors the current reading the United States Supreme Court has given the Second Amendment and would then change to reflect that Court's future readings." *State v. Hall*, 65 Kan. App. 2d 369, 373, 564 P.3d 786 (2025).

Issues not adequately briefed are deemed waived or abandoned. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021); *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020) (A point raised incidentally in a brief and not argued therein is deemed waived or abandoned.). Because Wilson makes no supported argument that K.S.A. 21-6332(a) violates section 4 of the Kansas Constitution's Bill of Rights, we find that Wilson has waived such a claim.

We move then to the crux of Wilson's argument—that K.S.A. 21-6332(a) violates the Second Amendment to the United States Constitution. Wilson makes two distinct constitutional claims. First, Wilson raises a facial challenge to K.S.A. 21-6332(a), citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). Within that argument, Wilson claims that K.S.A. 21-6332(a) is both facially unconstitutional and as applied to her. Second, Wilson argues that K.S.A. 21-6332(a) is unconstitutionally vague and overbroad. We address each of these arguments in turn.

*Facial Challenge*

Wilson asserts K.S.A. 21-6332(a) is unconstitutional on its face and as applied to her. The Second Amendment to the United States Constitution states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It guarantees an "individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626.

Since Wilson asserts a violation of the Second Amendment to the United States Constitution, our analysis is "controlled by United States Supreme Court precedent interpreting that provision. Accordingly, we apply federal constitutional principles as articulated by the Supreme Court." *McCray*, 321 Kan. at 320.

To mount a successful facial challenge, a litigant is generally required "to establish that the law is unconstitutional in all its applications. Thus, for the State to prevail in a facial challenge, it need only demonstrate that the law is constitutional in at least some

applications." *McCray*, 321 Kan. at 320 (citing *United States v. Rahimi*, 602 U.S. 680, 693, 701, 144 S. Ct. 1889, 219 L. Ed. 2d 351 [2024]; *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 [1987]).

Wilson's challenge pertains to K.S.A. 21-6332(a)—a statute that regulates the possession and/or carrying of a loaded firearm while intoxicated. We are first tasked with interpreting "the statute's text and legislative purpose to understand what the Legislature sought to accomplish." *McCray*, 321 Kan. at 320. We must then "apply the Second Amendment framework articulated by the United States Supreme Court by comparing the Kansas statute with relevant historical analogues." *McCray*, 321 Kan. at 320. Through these steps, we seek to determine whether K.S.A. 21-6332(a) impermissibly infringes on the Second Amendment.

In *Bruen*, the United States Supreme Court explained the analysis courts should undertake to determine if a firearm regulation is consistent with the Second Amendment. The Court stated that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command. *Bruen*, 597 U.S. at 24.

*Legislative Intent*

Our first step is to determine the legislative intent of K.S.A. 21-6332(a), which states:

"Possession of a firearm under the influence is knowingly possessing or carrying a loaded firearm on or about such person, or within such person's immediate access and control

8

while in a vehicle, while under the influence of alcohol or drugs, or both, to such a degree as to render such person incapable of safely operating a firearm."

The "most fundamental rule of statutory interpretation is that the Legislature's intent governs if we can ascertain that intent." *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). A reviewing court begins "'with the plain language of the statute, giving common words their ordinary meaning.'" *State v. Eckert*, 317 Kan. 21, 27, 522 P.3d 796 (2023). "When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words." *Eckert*, 317 Kan. at 27; see also *McCray*, 321 Kan. at 322.

The statute at issue pertains to possession of a firearm—a right provided for by the Second Amendment of the United States Constitution. But by its plain terms, the statute only prohibits possession of a firearm when specific conditions exist: (1) the firearm is loaded; (2) the firearm is being carried on a person's body or within their immediate access and control in a vehicle; and (3) a person is under the influence "to such a degree as to render such person incapable of safely operating a firearm." K.S.A. 21-6332(a). By its plain terms, K.S.A. 21-6332(a) acknowledges the potential danger a misused firearm presents and reflects a legislative intent to prevent harm inherent from the impaired judgment and decreased self-control that comes from being under the influence on a degree that a person is incapable of operating a firearm.

Bruen *Test*

We are next tasked with determining if the restriction on Second Amendment rights found in K.S.A. 21-6332(a) is consistent with our country's historical traditions. *Bruen*, 597 U.S. at 24. The "*Bruen* test" requires courts to use analogical reasoning:

9

"When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' [Citation omitted.]" *Bruen*, 597 U.S. at 28-29.

The *Bruen* Court went on to do discuss how such an analogical comparison should be conducted. "While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry. [Citation omitted.]" *Bruen,* 597 U.S. at 29.

The Kansas Supreme Court recently described the process of conducting a *Bruen* test in *McCray.* "Thus, to survive constitutional scrutiny, the modern law must restrict firearms for a comparable reason as an early law (the why or purpose) and do so to a comparable extent (the how or means)." *McCray*, 321 Kan. at 324. *McCray* analyzed the constitutionality of K.S.A. 21-6301(a)(18)—a statute that defines the crime of criminal use of weapons. The subsection at issue in *McCray* prohibited "possessing any firearm by a person who, within the preceding five years, has been convicted of a misdemeanor for a domestic violence offense, or a misdemeanor under a law of another jurisdiction which is substantially the same as such misdemeanor offense." K.S.A. 21-6301(a)(18). In comparing this statute to historical analogues, the court first held that the "why" had been satisfied, finding that "legislatures may disarm those who present a danger of interpersonal violence, and surety and going-armed laws from the founding era confirm that disarming individuals deemed threats to public peace was consistent with the Second

10

Amendment." *McCray*, 321 Kan. at 329-30 (citing *Rahimi*, 602 U.S. at 697-700). The Kansas Supreme Court also found that the "how" had also been satisfied, noting that the statute imposed a narrow and temporary burden that was less than that imposed by federal law. *McCray*, 321 Kan. at 330.

Though the statute at issue in *McCray* was different than that in this case, we find our Supreme Court's methodology compelling. Thus, we examine whether K.S.A. 21-6332(a) restricts "firearms for a comparable reason as an early law (the why or purpose) and do so to a comparable extent (the how or means)." *McCray*, 321 Kan. at 324.

We begin our analysis with a contextual history of gun regulation. It is "widely understood that the Second Amendment . . . codified a pre-existing right." *Heller*, 554 U.S. at 592. See also *Bruen*, 597 U.S. at 20. Historical gun laws in America restricted "people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693.

In applying the *Bruen* test, we are tasked with examining whether K.S.A. 21-6332(a) has analogues in historical common-law offenses, statutory prohibitions, and surety statutes. The Second Amendment was adopted in 1791 and the Fourteenth Amendment in 1868. The *Bruen* Court noted that "[h]istorical evidence that long predates or postdates either time may not illuminate the scope of the right." 597 U.S. at 4.

When considering gun regulation in the timeframe the Second Amendment was adopted in 1791, the *Rahimi* Court noted two "legal regimes" had developed by the 1700s and early 1800s: surety laws, which "provided a mechanism for preventing violence before it occurred" and going armed laws that "provided a mechanism for punishing those who had menaced others with firearms." 602 U.S. at 694-95, 697. "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." 602 U.S. at 698.

11

Though the gun regulation in *Rahimi* related to domestic violence rather than intoxication, in its discussion the Court nonetheless noted that the government has historically required the disarmament of those that are under the influence. "At the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers." *Rahimi*, 602 U.S. at 691 (citing Act of Mar. 1, 1783, 1783 Mass. Acts and Laws ch.13, pp. 218-19; 5 Colonial Laws of New York ch. 1501, pp. 244-46 [1894]).

A number of federal court decisions describe our nation's historical regulation of firearms within the context of intoxication. We find the historical summaries provided in these decisions useful in that they are accurate and succinct, and we review those summaries here.

In *United States v. Seiwert*, 152 F.4th 854, 858 (7th Cir. 2025), John Seiwert alleged 18 U.S.C. 922(g)(3) violated his Second Amendment right to possess a firearm on its face and as applied, and because the statute was unconstitutionally vague. 18 U.S.C. 922(g)(3) makes it illegal for any person **"**who is an unlawful user of or addicted to any controlled substance . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. 922(g)(3).

When a search warrant was executed at Seiwert's home, drugs and guns were found. Seiwert was charged with two counts of possessing a firearm while knowing that he was an unlawful user of, and addicted to, a controlled substance in violation of 18 U.S.C. § 922(g)(3). Seiwert admitted to suffering from heroin and crack cocaine addiction for 20 years. Seiwert also admitted to using cocaine a few hours prior to the search. 152 F.4th at 858-60.

12

In considering Seiwert's Second Amendment challenge, the court first noted that as in Rahimi, the government was unable to identify a historical regulation exactly matching 18 U.S.C. § 922(g)(3). 152 F.4th at 863. Then, the court reviewed historical laws regulating intoxication:

"Some colonies and states in the Founding Era enacted surety regimes, making drunkards either give security for good behavior or be imprisoned and thus disarmed. See, e.g., Act of 1662, *reprinted in Acts and Laws, of His Majesties Colony of Rhode-Island, and Providence-Plantations in America* 9, 11 (Boston, 1719); An Act Against Breaking the Peace, *reprinted in Acts and Laws of the State of Connecticut, in America* 188, 189 (Hartford, 1786); Act of 1623, *reprinted in Public Laws of the State of South-Carolina, from Its First Establishment as a British Province Down to the Year 1790*, Inclusive app. at 26 (Philadelphia, 1790); Act of Dec. 26, 1792, *reprinted in Digest of the Laws of Virginia* 756, 756 n.2 (Joseph Tate ed., 2d ed., Richmond, 1841) (citing Michael Dalton, The Country Justice 293 (1682)); Act of Dec. 16, 1812, *reprinted in Digest of the Laws of the Corporation of the City of Washington, to the First of June*, 1823, 141, 141 (Samuel Burch ed., Washington, D.C., 1823) (providing that 'persons found . . . drunk in or about the streets' may be 'required to enter into security for good behavior for a reasonable time' and 'shall be confined to labor for a time not exceeding ninety days' in case of refusal or inability to give security); see also Act of 1739–1740, *reprinted in 1 Laws of the State of Delaware* 173, 173-74 (New Castle, Del., 1797) (levying a fine for drunkenness and further allowing a drunkard to be 'bound to his or her good behavior' when sued for resisting arrest or using 'abusive, reviling or threatening speeches against' the court); Act of 1723, *reprinted in Digest of the Laws of Maryland* 205, 205-06 (Thomas Herty ed., Baltimore, 1799) (penalizing drunkenness in the presence of various officials and providing that those who revil[e]' officers 'in the execution of this act, shall give security . . . for his good behavior for three months, or suffer one month's imprisonment without bail')." 152 F.4th at 864-65.

The court went on to review historical regulations addressing combined firearm use and intoxication:

13

"It is not surprising, then, that at least one colonial legislature specifically regulated firearm use by individuals while they were drinking. In 1656, the Virginia legislature prohibited 'shoot[ing] any gun[s] at drinkeing [events].' While the express intent of this law was to ensure the preservation of gunpowder, underlying it was the belief that a drunken person could not dependably operate a firearm. Act of Mar. 10, 1656, *reprinted in 1 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year* 1619, 401, 401-02 (William Waller Hening ed., New York, 1823).

"That same common-sense notion can be found in similar ordinances from the Founding Era. A 1731 Rhode Island law barred using firearms in taverns after dark. Act of 1731 & 1737, *reprinted in Acts and Laws of the English Colony of Rhode Island and Providence-Plantations* 120, 120 (Newport, 1767). Likewise, in 1771, New York prohibited firing guns during the New Year's holiday to 'prevent[ ] the "great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor."' *Heller*, 554 U.S. at 632 (quoting Act of Feb. 16, 1771, *reprinted in 5 Colonial Laws of New York from the Year 1664 to the Revolution* 244, 244-46 (Albany, 1894)).

"Militia laws from the 1700s, though limited in application, further reflect Founding-era concerns about permitting intoxicated individuals to carry firearms. For example, New Jersey, Pennsylvania, and South Carolina each had statutes disarming or authorizing the confinement of drunk soldiers. See Act of May 8, 1746, *reprinted in 2 Selective Serv. Sys.*, *Military Obligation: The American Tradition*, pt. 8 at 25-26 (1947) (New Jersey statute providing that 'if any Soldier shall . . . appear in Arms disguised in Liquor, it shall and may be lawful for the Captain or Commanding Officer to disarm such Soldier at the Head of his Company'); Act of Mar. 20, 1780, *reprinted in Selective Serv. Sys., supra*, pt. 11 at 97 (Pennsylvania statute providing that 'if any non-commissioned officer or private shall . . . be found drunk . . . he shall be disarmed'); Act of Feb. 26, 1782, reprinted in Selective Serv. Sys., supra, pt. 13 at 96 (South Carolina statute providing that soldiers may be 'cashiered' or 'confined till sober' if 'found drunk on guard'). And other legislatures prohibited the sale of alcohol to local soldiers. Act of May 22, 1756, *reprinted in Selective Serv. Sys., supra*, pt. 5 at 83, 93 (Maryland statute); Act of May 8, 1703, § 19, *reprinted in Selective Serv. Sys., supra*, pt. 13 at 8, 13 (South Carolina statute).

"As we move to the mid- to late-nineteenth century and early twentieth century, at least three states continued the tradition of prohibiting drunken individual from carrying firearms. Act of Feb. 23, 1867, § 1, 1867 Kan. Sess. Laws 25, 25 (providing that 'any person under the influence of intoxicating drink . . . who shall be found within the limits of this State, carrying on his person a pistol . . . or other deadly weapon, shall be subject to arrest upon charge of misdemeanor'); Act of Feb. 28, 1878, § 2, 1878 Miss. Laws 175, 175 (prohibiting the sale of firearms 'to any . . . person intoxicated, knowing him to be . . . in a state of intoxication'); Mo. Rev. Stat. § 1274 (1879) (criminalizing the carrying of 'any kind of firearms . . . or other deadly weapon' 'when intoxicated or under the influence of intoxicating drinks'); Act of Apr. 3, 1883, § 3, 1883 Wis. Sess. Laws 290, 290 (prohibiting 'go[ing] armed with any pistol or revolver' 'in a state of intoxication'); Act of Feb. 17, 1909, 1909 Idaho Sess. Laws 6, 6 (prohibiting the carrying of any 'pistol, revolver, gun, or any other deadly or dangerous weapon . . . when intoxicated, or under the influence of intoxicating drinks'). It is true that these restrictions were enacted more than a century after the Founding. But absent any indication that these regulations 'contradict[ ] earlier evidence,' they are pertinent to our inquiry." 152 F.4th at 865-66.

The court found Seiwert was "an unlawful user of, and addicted to, a controlled substance" under 18 U.S.C. § 922(g)(3). The court also described various ways that "excessive alcohol consumption, heroin and cocaine use typically causes immediate deficits in cognitive function [citations omitted]." 152 F.4th at 860, 866. The court concluded,

"Thus, as applied to Seiwert, § 922(g)(3) performs the same function as historical laws directed at intoxicated individuals and in the same way:  it prohibits individuals whose cognitive abilities are presently hampered by chemical substances from possessing firearms in order to safeguard the public. In this way, § 922(g)(3) as applied to Seiwert is relevantly similar to historical laws prohibiting intoxicated individuals from having firearms and passes constitutional muster." 152 F.4th at 866.

The court concluded that Seiwert's facial challenge failed and the statute was constitutional as applied to Seiwert. 152 F.4th at 872.

In *United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024), the Eighth Circuit was faced with a facial challenge to the same statute, 18 U.S.C. 922(g)(3). The court began its analysis with the history of the "regulation of intoxicating substances," noting this as a "general societal problem[] for thousands of years" and "[c]olonial times were no exception." 98 F.4th at 910.

The court stated,

"When a 'challenged regulation [like § 922(g)(3)] addresses a general societal problem that has persisted since the 18th century,' like substance abuse, 'the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.' *Bruen*, 597 U.S. at 26, 142 S. Ct. 2111. 'Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.' Id. at 26-27, 142 S. Ct. 2111. Our task is to figure out whether § 922(g)(3) looks like anything that 'earlier generations' did to keep firearms out of the hands of drug and alcohol users. Id. at 26, 142 S. Ct. 2111." 98 F.4th at 911.

The court discussed *Bruen*'s rationale:

"When it comes to regulations 'implicating unprecedented societal concerns,' *Bruen* is clear that we cannot look at history through a pinhole. Id. Rather, we must take 'a more nuanced approach,' again 'reasoning by analogy,' to determine whether there is 'a well-established and representative historical analogue' that could make § 922(g)(3) constitutional in some of its applications. Id. at 27-30, 142 S. Ct. 2111; see *Raines*, 362 U.S. at 22, 80 S. Ct. 519. It turns out there is." 98 F.4th at 912.

The *Veasley* court then focused on regulations that addressed firearms and mental illness because of the "intuitive similarity" between mental illness and drug use. 98 F.4th at 912. The court stated that the "legal view of mental illness in the 18th century was different than it is now. Many believed it to be a transitory condition, just like intoxication. . . . The common belief was that they had 'lucid intervals' or periods during

16

which they 'enjoy[ed] [their] senses. [Citations omitted.]'" 98 F.4th at 913. Likewise, drunkenness was described as a type of "temporary insanity." 98 F.4th at 913.

"By the late 1800s, state legislatures allowed the prosecution of people who gave guns to the mentally ill. An 1881 Florida law, for example, made it illegal 'to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife.' Act of Feb. 4, § 1, 1881 Fla. Laws 87. And in Kansas, it was unlawful to sell 'any pistol, revolver or toy pistol . . . or other dangerous weapons to . . . any person of notoriously unsound mind.' Act of Mar. 5, § 1, 1883 Kan. Sess. Laws 159. Along with the even longer tradition of confinement, these laws suggest that society made it a priority to keep guns out of the hands of anyone who was mentally ill and dangerous. See *Heller*, 554 U.S. at 626-27, 128 S. Ct. 2783 (reaffirming that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill'); *McDonald v. City of Chicago*, 561 U.S. 742, 786, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) ('repeat[ing] th[at] assurance').

"The 'burden' imposed by § 922(g)(3) is 'comparable,' if less heavy-handed, than Founding-era laws governing the mentally ill. *Bruen*, 597 U.S. at 29, 142 S. Ct. 2111. It goes without saying that confinement with straitjackets and chains carries with it a greater loss of liberty than a temporary loss of gun rights. And the mentally ill had less of a chance to regain their rights than drug users and addicts do today. See 1 Blackstone, Commentaries *294 (explaining that the law 'always imagines . . . [their] accidental misfortunes may be removed'). Stopping the use of drugs, after all, restores gun rights under § 922(g)(3)." 98 F.4th at 915.

"Just like its historical counterparts, § 922(g)(3) does not criminalize mere possession. It requires another act, the taking of drugs, which itself can cause terrifying and dangerous behavior. See *Landry*, supra, at 108. The decision to engage in illegal and dangerous conduct, in other words, is what leads to a temporary deprivation, which ends once the illegal behavior does. In that way, § 922(g)(3) imposes a 'comparable burden' on the right to bear arms. *Bruen*, 597 U.S. at 29, 142 S. Ct. 2111." 98 F.4th at 917.

17

When comparing 18 U.S.C. 922(g)(3), which has consistently survived constitutional scrutiny, with K.S.A. 21-6332(a), it is also clear that the Kansas statute is much less restrictive in scope. K.S.A. 21-6332(a) only applies to an individual *while they are under the influence* in the vehicle and only when a *loaded* firearm is accessible. The prohibitions under 18 U.S.C. 922(g)(3) cover a much broader scope.

Finally, in *United States v. Espinoza-Melgar*, 687 F. Supp. 3d 1196, 1199-1200 (D. Utah 2023), Jose Angel Espinoza-Melgar was also charged under the same statute, 18 U.S.C. 922(g)(3), and argued the statute violated the Second Amendment and was unconstitutionally vague.

When Espinoza-Melgar was arrested, officers found a firearm and 3 grams of marijuana. Espinoza-Melgar admitted to having a daily marijuana habit for many years. 687 F. Supp. 3d at 1199. Using the *Bruen* framework, the federal district court determined that Espinoza-Melgar's conduct was covered by the plain text of the Second Amendment which allows for possession of firearms. 687 F. Supp. 3d at 1200-01. It then determined that "both the 'why' and the 'how' regarding § 922(g)(3)'s firearm-possession restrictions are analogous to historical regulations." 687 F. Supp. 3d at 1203.

The court found that the burden imposed by the statute is "analogous to historical prohibitions of firearm possession." 687 F. Supp. 3d at 1206. The *Espinoza-Melgar* court continued,

> "Founding-era firearm regulations 'recognized that guns and alcohol were a bad combination.' *United States v. Lewis*, Case No. CR-22-368-F, 650 F.Supp.3d 1235, 1242 n.5 (W.D. Okla., Jan. 13, 2023); *Fried v. Garland*, 640 F.Supp.3d 1252, 1261-62 (N.D. Fla. 2022) (recognizing a history of statutes from the founding and reconstruction eras that restricted gun possession by the intoxicated). Moreover, countless Founding-era firearms restrictions banned possession based on the possessor's *status*, not based solely on that individual's other activities at the time of possession." 687 F. Supp. 3d at 1206.

18

The court stated it joined an "overwhelming majority of courts that have considered whether § 922(g)(3) passes constitutional muster after *Bruen*—and concluded that it remains a constitutional restriction on firearm possession." 687 F. Supp. 3d at 1208. As of August 2023, the court "was aware of 28 district court cases that had analyzed whether § 922(g)(3) is constitutional after the Supreme Court's *Bruen* decision. In 26 of those 28 cases, the district judges concluded that § 922(g)(3) remains constitutional after *Bruen*." 687 F. Supp. 3d at 1208.

Here, we find that K.S.A. 21-6332(a) is similar to historical regulations that concluded "guns and alcohol were a bad combination." *United States v. Lewis*, 650 F. Supp. 3d 1235, 1242 n.5 (2023).

We pause to note several specific arguments raised by Wilson. Wilson argues that K.S.A. 21-6332(a) is not analogous to any historical Anglo-American common-law offense because the statute lacks a specific intent to terrorize or achieve a mischievous result. Wilson states that at common-law, the offense of "affray" was the only offense thought to apply to the bearing of arms that continues to persist through arms regulation, citing *Bruen*, 597 U.S. at 50-51. Wilson argues that K.S.A. 21-6332(a) could not be based on the historical common-law offense of affray because the statute does not require a specific intent. She notes that affray requires bearing arms "for a 'wicked purpose' with a 'mischievous result.'" 597 U.S. at 50-51.

The State responds in its brief that "a 'wicked purpose' associated with carrying arms is merely carrying them 'in such [a] manner as naturally will terrify and alarm . . . [or] 'for the purpose of an affray, and in such manner as to strike terror to the people.' [Citation omitted.] *Bruen*, 597 U.S. at 51-52." Wilson does not provide support that affray requires *specific* intent. And specific intent does not appear to be the focus of the analysis of affray in *Bruen* or *Rahimi*.

19

Wilson also argues that K.S.A. 21-6332(a) is not analogous to historical gun regulation because it is not restricted to special places. Wilson cites the Statute of Northampton for her proposition, noting that two categories of conduct were covered by the English statute—conduct and sensitive places. But the *Bruen* Court stated the Statute of Northampton "has little bearing on the Second Amendment adopted in 1791" as it "was enacted nearly 20 years before the Black Death, more than 200 years before the birth of Shakespeare, more than 350 years before the Salem Witch Trials, more than 450 years before the ratification of the Constitution, and nearly 550 years before the adoption of the Fourteenth Amendment." 597 U.S. at 41.

Wilson also argues that since K.S.A. 21-6332(a) does not require a judicial finding that the firearm bearer is dangerous, the statute is also not analogous to historical regulations. Wilson bases her argument on surety law, noting that arms regulations did not apply to everyone, but only to individuals who were found to have physically threatened others. In those situations, individuals were sometimes required "to post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55. But the cases cited by Wilson do not prove that as part of every historical firearm regulation, a court was required to make a judicial finding that the regulation applied, before it applied. To the contrary, we have cited numerous historical regulations in this opinion where the intoxicated use of firearms was prohibited without a prior judicial finding.

The gist of Wilson's arguments is that she believes K.S.A. 21-6332(a) must exactly replicate its historical predecessors to survive constitutional scrutiny. We believe the response to Wilson's argument lies in *Bruen*. The *Bruen* Court carefully noted that while not every modern firearm regulation should be upheld as an exception to the guarantees of the Second Amendment, at the same time, there is no requirement that the modern regulation exactly mimic historical requirements:

20

"To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.' *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (Emphasis added.) 597 U.S. at 30.

After a thorough review of our Kansas statute, and our nation's history of firearm regulations we find that the Legislature's careful crafting of K.S.A. 21-6332(a) satisfies the *Bruen* test. As to the "why" portion of the *Bruen* test, K.S.A. 21-6332(a) is directed at individuals who are "knowingly possessing or carrying a loaded firearm on or about such person, or within such person's immediate access and control while in a vehicle, while under the influence of alcohol or drugs, or both, to such a degree as to render such person incapable of safely operating a firearm." K.S.A. 21-6332(a). We find that the statute was created by the Legislature to protect others from a person's dangerous use of a loaded firearm that occurs while that person is intoxicated to a degree that they cannot safely operate the firearm. The Legislature's limitation applies to only a very narrow category of persons. A person who is *not* intoxicated is free to possess a loaded weapon on their person, or in their vehicle. And a person who *is* intoxicated may still possess an *unloaded* weapon. But the Legislature has narrowly carved out a protection against the dangerous combination of intoxication and possession of a loaded firearm, and that prohibition follows a number of analogous examples from our nation's history as referenced in this opinion. And as our Kansas Supreme Court has noted, "surety and going-armed laws from the founding era confirm that disarming individuals deemed threats to public peace was consistent with the Second Amendment." *McCray*, 321 Kan. at 329-30 (citing *Rahimi*, 602 U.S. at 697-700).

21

Moreover, we find that under K.S.A. 21-6332(a), a person who is intoxicated is not permanently banned from possessing a loaded weapon; rather, the prohibition ends when the person is no longer intoxicated. In comparison to a similar federal statute, 18 U.S.C. 922(g)(3), we note that our Kansas statute operates under much narrower parameters. The federal statute applies to all firearms, whereas the Kansas statute only prohibits possession of *loaded* firearms. And the federal statute applies to those addicted to drugs without any time limitation. In comparison, our Kansas statute is limited in duration and only applies while a person is intoxicated to a degree they cannot safely operate a firearm. K.S.A. 21-6332(a). We believe the temporary limitation found in K.S.A. 21-6332(a) satisfies the "how" portion of the test from *Bruen. McCray*, 321 Kan. at 330.

We conclude by returning to *Rahimi*. "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 602 U.S. at 702. Here, after considering the test stated in *Bruen,* we find that K.S.A. 21-6332(a) is a narrow exercise of legislative authority. It follows the historically recognized purpose of preventing harm to persons that occurs from the use of a loaded firearm while intoxicated and prohibits conduct in a narrow and temporary fashion. We find that Wilson's facial challenge to K.S.A. 21-6332(a) therefore fails.

*"As Applied" Challenge*

Wilson has alternatively argued that K.S.A. 21-6332(a) was unconstitutionally applied to her. "Unlike a facial challenge, an as-applied claim looks at whether the particular factual circumstances create a constitutional violation." *State v. Hall*, 65 Kan. App. 2d 369, 389, 564 P.3d 786 (2025). The party who asserts a constitutional violation "must establish the necessary predicate facts by a preponderance of the evidence." *Hall*, 65 Kan. App. 2d at 389.

Wilson's "as applied" challenges are limited and are extensions of her previous facial challenge arguments. She first alleges that K.S.A. 21-6332(a) is unconstitutional as applied because Wilson never touched the firearm during the encounter with law enforcement. She points out that the only person who touched Wilson's firearm was Officer Ervin who seized it as evidence. Wilson reasons that since she never touched the firearm, there was no evidence that she intended to use it for a wicked purpose. But Wilson's argument is inextricably linked to her argument that K.S.A. 21-6332(a) is not historically analogous to Anglo-American common law because it does not require a wicked purpose or intent, such as in the common-law offense of affray. But as we have pointed out, Wilson does not provide support that affray requires specific intent. We reiterate that K.S.A. 21-6332(a) follows historical analogues that serve to prevent harm from the use of a loaded firearm while intoxicated.

Wilson also argues in a single sentence in her brief that K.S.A. 21-6332(a) is not analogous to historical gun regulation because it is not limited to regulating a specific place, and there are no allegations that Wilson was in a special place. We have previously disposed of this argument by finding the basis of Wilson's argument, the Statute of Northampton, is not relevant. *Bruen*, 597 U.S. at 41. We also find that Wilson has failed to adequately brief her "as applied" challenge as it pertains to the requirement of a "special place." A point raised incidentally in a brief and not argued therein is deemed waived or abandoned. *Meggerson*, 312 Kan. at 246.

Wilson's final "as applied" argument is that K.S.A. 21-6332(a) violates the Second Amendment because it does not require any judicial finding that the firearm bearer is dangerous. Wilson notes that she was not found by a court to be dangerous and had no opportunity to contest she is dangerous and should be disarmed. Again, Wilson's "as applied" argument is mentioned in a single sentence, and she has failed to adequately brief her argument. 312 Kan. at 246. Moreover, we have determined that numerous courts

have described a history of firearm regulation that prohibited the intoxicated use of firearms without a judicial finding that the person was dangerous.

*Vagueness and Overbreadth Challenge*

Wilson next alleges that K.S.A. 21-6332(a) violates the Fifth and Fourteenth Amendments to the United States Constitution by use of language that is vague and overbroad. Under the Fifth Amendment, "No person shall . . . be deprived of life, liberty, or property, without due process of law." And under the Fourteenth Amendment, no State may "deprive any person of life, liberty, or property, without due process of law." Together, these amendments provide the basis of due process. In the context of statutory language, due process requires "the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926).

Statutes are presumed constitutional, and all doubts must be resolved "in favor of a statute's validity. Further, we must interpret a statute in a manner that renders it constitutional if there is any reasonable construction that will maintain the legislature's apparent intent. [Citations omitted.]" *Gonzalez*, 307 Kan. at 579. The party challenging constitutionality "carries the burden of overcoming that presumption." 307 Kan. at 579.

The United States Supreme Court has emphasized that "the void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155-56, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018). It "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." 584 U.S. at 156. "In determining whether a criminal statute is so vague that it violates due process, appellate courts conduct a two-prong

24

inquiry, asking: (1) whether the statute gives fair warning to those potentially subject to it; and (2) whether it adequately guards against arbitrary and unreasonable enforcement." *Gonzalez*, 307 Kan. at 580.

### 1. *Vagueness challenge under K.S.A. 21-6332(c)(2)*

In denying Wilson's motion to declare K.S.A. 21-6332(a) unconstitutional, the district court adopted the State's brief and response to Wilson's motion to dismiss in full as its order. That response, which became the order, alleged Wilson lacked standing to bring a vagueness challenge because there was no scenario in which K.S.A. 21-6332(c)(2) would apply to her. As a result of adopting the State's response, the district court's order held that Wilson did not have standing to bring her vagueness claim under K.S.A. 21-6332(c)(2).

The State raises the issue of standing within its brief, arguing that Wilson has abandoned any challenge to the district court's ruling that she lacked standing to bring this claim. It is true that Wilson did not mention or brief the issue of standing in her appeal. But the State also acknowledges the Kansas Supreme Court's recent ruling in *State v. Stubbs*, 320 Kan. 568, 570 P.3d 1209 (2025). Prior to *Stubbs*, the traditional standing test required a party to demonstrate he or she personally "suffered a cognizable injury" and "a causal connection between the injury and the challenged conduct." *State v. Bodine*, 313 Kan. 378, 385, 486 P.3d 551 (2021). But in *Stubbs*, the Kansas Supreme Court revisited the issue of standing. It explained that the party asserting the claim "must show both a cognizable injury and a causal connection to the challenged conduct." *Stubbs*, 320 Kan. at 579. Stubbs alleged the Legislature lacked constitutional authority to enact the statute he was convicted and imprisoned under. In finding Stubbs had standing, the court stated, "This presents exactly the kind of concrete injury our standing doctrine requires—and that injury flows directly from the challenged conduct, the Legislature's enactment of an allegedly void statute." *Stubbs*, 320 Kan. at 579. We find under *Stubbs*

25

that Wilson had standing to bring her claim. But we also conclude, as we explain herein, that the district court reached the correct result for the wrong reason. See *State v. May*, 293 Kan. 858, 870, 269 P.3d 1260 (2012) (correct result reached by district court will be upheld even if reached by reliance on wrong grounds or erroneous reasoning). Our review of the constitutionality of a statute is unlimited, and as we explain, K.S.A. 21-6332(a) is not unconstitutionally vague.

Having confirmed standing, we return to Wilson's argument that K.S.A. 21-6332(a) is unconstitutionally vague and subject to arbitrary enforcement because of K.S.A. 21-6332(c)(2). K.S.A. 21-6332(c) references K.S.A. 21-6332(a), and states:

> "(c) This section shall not apply to:
>
> (1)     A person who possesses or carries a firearm while in such person's own dwelling or place of business or on land owned or possessed by such person; or
>
> (2)     the transitory possession or use of a firearm during an act committed in self-defense or in defense of another person or any other act committed if legally justified or excused, provided such possession or use lasts no longer than is immediately necessary." K.S.A. 21-6332(c).

Wilson's vagueness challenge is premised on the theory that K.S.A. 21-6332(c) leads to "arbitrary and unreasonable enforcement." *Gonzalez*, 307 Kan. at 580. Wilson's argument is based on a hypothetical situation. She believes the statute "creates a factually impossible scenario" because an intoxicated person is prohibited from having a loaded weapon in their vehicle unless necessary. Wilson argues that it is largely impossible to store a firearm outside a person's immediate access but still within a vehicle. She points out that a person who is intoxicated but in need of armed protection has no viable option. The intoxicated person must take shelter in their vehicle, but only unarmed, or drive home to take shelter, putting others at risk due to their intoxication.

"A criminal statute is not unconstitutionally vague under an arbitrary-enforcement theory merely because officials might sometimes struggle to determine whether particular conduct violates it. Rather, a statute becomes unconstitutionally vague when it fails to define what conduct it prohibits." *Stubbs*, 320 Kan. 568, Syl. ¶ 10. The *Stubbs* court focused on the language of the statute at issue, K.S.A. 21-6301(a)(2), and noted the statute did not

"criminalize mere possession. Instead, it requires both that defendants 'knowingly' possess the dangerous knife and that they do so with the 'intent to use' it 'unlawfully against another.' These scienter requirements provide meaningful constraints on enforcement discretion. . . .

"In sum, K.S.A. 21-6301(a)(2) contains sufficiently explicit standards to prevent arbitrary enforcement. The Moore definition of 'dangerous knife' and the statute's intent requirement provide reasonably clear constraints on enforcement discretion. And as a result, the Legislature has not impermissibly delegated its core responsibility for defining criminal conduct to other branches of government, contrary to separation-of-powers principles." 320 Kan. at 588.

Criminal statutes need only "set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'" 320 Kan. at 586. We find that the language of K.S.A. 21-6332(a) sets out reasonably clear guidelines that prohibit conduct in limited circumstances. And on the occasion there is a threat requiring a person to act in self-defense, K.S.A. 21-6332(c)(2) allows a person to do so with a firearm.

We are required to presume that K.S.A. 21-6332(a) is constitutional. Statutes are presumed constitutional, and all doubts must be resolved "in favor of a statute's validity." *Gonzalez*, 307 Kan. at 579. We find here that Wilson has failed to carry her burden of overcoming this presumption.

27

## 2. *Vagueness challenge to term "about," "immediate access," and "loaded"*

Wilson next alleges that K.S.A. 21-6332(a) is vague because it "fails to provide adequate direction for one to steer between lawful and unlawful conduct because terminology like about, immediate access, and loaded enable policemen, prosecutors, judges, and juries to resolve their meaning on an ad hoc subjective basis." We interpret Wilson's argument to challenge whether the forementioned terms "give fair warning to those potentially subject" to them and whether the terms "adequately guard[] against arbitrary and unreasonable enforcement." *Gonzalez*, 307 Kan. at 580.

Wilson cites no statutory language, legal precedent, or dictionary definitions to support her allegations. She again supports her argument with hypotheticals. We find that Wilson has failed to adequately brief her allegations that each of these terms is vague and, as a result, she has abandoned her claim. *Meggerson*, 312 Kan. at 246; *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

And on the merits, we note that in *City of Wichita v. Hackett*, 275 Kan. 848, 853-54, 69 P.3d 621 (2003), the Kansas Supreme Court held a statute is not void for vagueness "where it employs words commonly used, previously judicially defined, or having a settled meaning in law." As a reviewing court, we consider the challenged words in context and give "words in common use their ordinary meaning." *Bruce v. Kelly*, 316 Kan. 218, 249, 514 P.3d 1007 (2022). And as the State points out, "Dictionary definitions are good sources for the 'ordinary, contemporary, common' meanings of words." *Midwest Crane & Rigging, LLC v. Kansas Corp. Comm'n*, 306 Kan. 845, 851, 397 P.3d 1205 (2017).

We first turn to the statutory term, "about." K.S.A. 21-6332(a) prohibits "knowingly possessing or carrying a loaded firearm on or *about* such person, or within such person's immediate access and control while in a vehicle . . . ." (Emphasis added.)

28

K.S.A. 21-6332(a). The meaning of "on or about such person" is straightforward. When used as a preposition, one definition from Merriam-Webster Online Dictionary of the term "about" is "on or near the person of." It is clear that K.S.A. 21-6332(a) criminalizes carrying a loaded firearm on or near a defendant's person.

The term "immediate access" also has a common, ordinary meaning. "Immediate" is defined in the Merriam-Webster Online Dictionary as "occurring, acting, or accomplished without loss or interval of time." One definition of "access" from Merriam-Webster Online Dictionary is "freedom or ability to obtain or make use of something." Read together, it is clear from the ordinary meaning of the terms that in K.S.A. 21-6332(a), the Legislature intended to criminalize possessing or carrying a loaded firearm when that firearm can be obtained or used without any loss of time.

Wilson also alleges the term "loaded" is vague. One definition from Merriam-Webster Online Dictionary provided in the context of "a loaded handgun" is "having bullets inside." The use of "loaded firearm" in K.S.A. 21-6332(a) is easily understood to mean a gun with bullets inside.

Each of these terms have ordinary meanings, are not vague, and give notice of what conduct is expected. We find Wilson's challenge to these terms based on vagueness is without merit.

*Overbreadth Challenge*

K.S.A. 21-6332(c)(1) provides that K.S.A. 21-6332(a) does not apply to "[a] person who possesses or carries a firearm while in such person's own dwelling or place of business or on land owned or possessed by such person." K.S.A. 21-6332(c)(1). Wilson alleges that the K.S.A. 21-6332(c)(1) is overbroad because it makes a distinction between

29

inside and outside the home. In other words, Wilson argues that because the statute is narrow, it is overbroad. Wilson's argument fails for several reasons.

First, Wilson again fails to support her point with pertinent authority. This is especially true in light of the fact Wilson has conceded the overbreadth doctrine generally applies to First Amendment issues. Wilson alleges K.S.A. 21-6332 presents an exception to the general rule because it "chills the exercise of a fundamental right" but fails to provide authority supporting that point. It is Wilson's burden to prove K.S.A. 21-6332(a) is unconstitutional in the context of her vagueness and overbreadth challenge. *Gonzalez*, 307 Kan. at 579-80. We note that the Kansas Supreme Court has held "[t]he overbreadth doctrine should be employed sparingly and only as a last resort." *Smith v. Martens*, 279 Kan. 242, 253, 106 P.3d 28 (2005). And overbreadth challenges have historically been limited to the First Amendment. *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). "And, outside the limited First Amendment context, a criminal statute may not be attacked as overbroad." *Schall v. Martin*, 467 U.S. 253, 268, n.18, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984).

Second, Wilson's argument fails on the merits. She argues that K.S.A. 21-6332(c)(1) provides K.S.A. 21-6332(a) shall not apply to "[a] person who possesses or carries a firearm while in such person's own dwelling or place of business or on land owned or possessed by such person[.]" Wilson argues that K.S.A. 21-6332(a) and K.S.A. 21-6332(c)(2), read together, violate the principles found in *Bruen*, because "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." 597 U.S. at 32. But the language cited by Wilson must be considered within its context:

> "We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.

30

"We have little difficulty concluding that it does. Respondents do not dispute this. See Brief for Respondents 19. Nor could they. Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Bruen*, 597 U.S. at 32.

The *Bruen* Court did not consider whether a statute similar to K.S.A. 21-6332 was overbroad. It considered whether the Second Amendment covered the right to keep and bear arms *in public*. Wilson's reliance on this language from *Bruen* is misplaced.

Additionally, even if an overbreadth challenge were available to Wilson under the Second Amendment, a successful overbreadth challenge is "made only when [1] the protected activity is a significant part of the law's target, and [2] there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications." *State v. Wilson*, 267 Kan. 550, 556-57, 987 P.2d 1060 (1999). Here, Wilson has failed to identify the protected activity which is significantly targeted by K.S.A. 21-6332(a). For all of these reasons, we find that Wilson has failed to carry her burden of proof to show K.S.A. 21-6332(a) is overbroad.

## DID SUFFICIENT EVIDENCE SUPPORT WILSON'S CONVICTION FOR DRIVING UNDER THE INFLUENCE?

*Standard of Review*

"'When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.' [Citations omitted.]" *Mendez*, 319 Kan. at 723.

"It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022).

*Discussion*

Wilson was charged with violating K.S.A. 8-1567(a)(2) or, in the alternative, K.S.A. 8-1567(a)(3). The statute reads:

"(a) Driving under the influence is operating or attempting to operate any vehicle within this state while:

. . . .

(2) the alcohol concentration in the person's blood or breath, as measured within three hours of the time of operating or attempting to operate a vehicle, is 0.08 or more; (3) under the influence of alcohol to a degree that renders the person incapable of safely driving a vehicle[.]" K.S.A. 8-1567(a)(2), (3).

The district court found Wilson guilty of both means of violating K.S.A. 8-1567. Wilson argues there was not sufficient direct or circumstantial evidence of any operation or attempt to operate the vehicle by Wilson. Wilson does contest that she was under the influence or that her blood alcohol concentration was above the legal limit.

Our analysis then focuses on whether there was sufficient evidence that Wilson was operating or attempting to operate a motor vehicle while intoxicated. In *Jarmer v. Kansas Dept. of Revenue*, 318 Kan. 671, 546 P.3d 743 (2024), the Kansas Supreme Court considered the difference between "'operating' and 'attempting to operate' a vehicle in the context of prosecutions for driving under the influence." *Jarmer*, 318 Kan. at 674.

The *Jarmer* court first noted that in *State v. Fish*, 228 Kan. 204, 612 P.2d 180 (1980), the court found "a conviction for driving under the influence based on 'operating' a vehicle requires 'some evidence, either direct or circumstantial, that the defendant drove the automobile while intoxicated.' 228 Kan. at 210." *Jarmer*, 318 Kan. at 674-75.

The *Jarmer* court went on to note that in *State v. Kendall*, 274 Kan. 1003, 1009, 58 P.3d 660 (2002), the court declined to broaden the definition of operation, stating that the Legislature had amended K.S.A. 8-1567 since *Fish* "but only to add 'attempted' operation of a vehicle to the definition of driving under the influence. 274 Kan. at 1009-10." *Jarmer*, 318 Kan. at 675. The *Kendall* court held that movement is required to convict for operating a vehicle but not required for attempting to operate the vehicle. 274 Kan. at 1009-10. Kendall was found in the driver's seat in the middle of the street "with the engine running, the headlights on, his foot on the brake, and his seat belt fastened." 274 Kan. at 1012. "Even if the jury believed Kendall did not move his vehicle while under the influence of alcohol, there was sufficient evidence to convict Kendall of DUI on the alternative theory that he attempted, but failed, to operate the truck." 274 Kan. at 1012.

The *Jarmer* court also reviewed its prior decision on the issue in *State v. Darrow*, 304 Kan. 710, 374 P.3d 673 (2016). In *Darrow*, the parties framed the issue narrowly, asking: "'Is fumbling with [the] gear shift while [the] vehicle is running, operating or attempting to operate a motor vehicle?' *Darrow*, 304 Kan. at 712." *Jarmer*, 318 Kan. at 675. The parties also stipulated Darrow drove to the place she was found by police. *Darrow* affirmed the holding in *Kendall*, agreeing that "'operate' as used in [the DUI] statute should be construed to mean 'drive,' thus requiring some evidence, either direct or circumstantial, that the defendant drove the automobile while intoxicated in order for the defendant to be convicted [of DUI]." *Kendall*, 274 Kan. at 1009 (quoting *Fish*, 228 Kan. at 210)." *Darrow*, 304 Kan. at 714. The amendment of K.S.A. 8-1567 "was designed to

encompass 'those who merely tried but failed' to drive the vehicle." 304 Kan. at 714. *Darrow* concluded:

> "[T]o 'operate' means to 'drive'; 'driving' requires movement of the vehicle; therefore, 'operating' requires movement of the vehicle, and an 'attempt to operate' means to attempt to move the vehicle. Taking actual physical control of the vehicle is insufficient to attempt to operate that vehicle without an attempt to make it move. *Darrow*, 304 Kan. at 714.

> "We further held that circumstantial evidence, when viewed in a light most favorable to the State, could support the conclusion that Darrow was attempting to make the car move by 'fumbling' with the gear shift. *Darrow*, 304 Kan. at 718-20." *Jarmer*, 318 Kan. at 675.

The Kansas Supreme Court recently revisited this issue in *State v. Zeiner*, 316 Kan. 346, 515 P.3d 736 (2022). In *Zeiner*, the court "observed that any actions taken by a defendant after he parked his car—such as turning on the lights and radio—could not be considered 'operating' the car, since these actions had no bearing on making the car move. *Zeiner*, 316 Kan. at 353." *Jarmer*, 318 Kan. at 676.

The *Zeiner* court analyzed two timeframes during the night Zeiner was arrested. First, the court counted the time from when Zeiner left an establishment to when he parked his vehicle. The second was from the time he parked until law enforcement arrived. *Zeiner*, 316 Kan. at 351. In finding there was sufficient evidence to uphold Zeiner's conviction, the court stated that, viewing the evidence in the light most favorable to the State, the circumstantial evidence created "a reasonable basis to conclude that Zeiner was drunk when he left Strong City." 316 Kan. at 351-52. Those facts included Zeiner's admission to drinking earlier in the evening, having been at a venue that served alcohol, found near his home, smelled like alcohol, was asleep in the vehicle, had consumed alcohol in the vehicle, failed field sobriety tests, and failed breath testing. 316 Kan. at 351.

Here, there is significant circumstantial evidence of Wilson's operation of a motor vehicle. "'Proof of driving does not require an eyewitness to the driving. It may be shown by circumstantial evidence.' *State v. Fish*, 228 Kan. 204, 210, 612 P.2d 180 (1980)." *Zeiner*, 316 Kan. at 351. Wilson was found asleep, slumped over the wheel with the horn blaring. The brake lights or taillights of the vehicle were illuminated, and the keys were in the ignition. Wilson was very near her home. And Wilson told Officer Fira that she was coming home from work and was near her home. Wilson stated to Fira, "[L]et me just turn over right here where that U is at," and gestured toward the intersection. Wilson also remarked that she was "trying to make it home." Wilson was upset with Officer Fira because she thought she had been pulled over for no reason. Wilson's statements were evidence that a fact-finder could reasonably rely upon to conclude Wilson had very recently driven to the place where she was found. When Wilson exited her vehicle, she was slurring her words and was unsteady. Wilson failed her breath test, registering at 0.166 at 7:37 a.m., approximately two hours after law enforcement initially found her.

The district court found Wilson guilty of violating K.S.A. 8-1567(a)(2) and (a)(3). The district court concluded that from the time she left work until found by the side of the road, Wilson was "unable to operate or attempt to operate a vehicle safely." We agree that viewed in a light most favorable to the State, sufficient evidence supported the district court's conclusion. *Mendez*, 319 Kan. at 723. There was significant circumstantial evidence that Wilson was operating a motor vehicle while intoxicated. We do not find sufficient evidence that Wilson attempted to operate her motor vehicle once it was stopped on the roadway, consistent with the holding in *Zeiner.* 316 Kan. at 351. And there was no evidence Wilson attempted to move the vehicle once it had stopped. *Darrow*, 304 Kan. at 714. But the district court's erroneous finding that Wilson attempted to operate the motor vehicle is inconsequential because the statute was violated if Wilson was either "operating or attempting to operate" a vehicle. K.S.A. 8-1567(a). If a district court reaches the correct result, its decision will be upheld even though it relied on the wrong ground or assigned erroneous reasons for its decision. *State v. Overman*, 301 Kan.

704, 712, 348 P.3d 516 (2015). Viewed in a light most favorable to the State, there was sufficient evidence that Wilson violated K.S.A. 8-1567(a)(2) and (a)(3).

Affirmed.